**FILED**

NOV 1 4 2019

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **19 CR 864** |
| | ) | |
| v. | ) | |
| | ) | Violation: Title 18, United States |
| ASHIK DESAI | ) | Code, Section 1343 |
| | ) | **Information** |
| | ) | |

JUDGE DURKIN

MAGISTRATE JUDGE HARJANI

The UNITED STATES charges that:

1.    At times material to this information:

a.    Outcome Health, Inc., also known as ContextMedia, Inc. ("Outcome") was a privately-held healthcare information and advertising company with headquarters located in Chicago, Illinois.  Outcome placed television screens, tablets and wallboards that displayed educational content into doctor's offices and then sold advertising space on those devices to pharmaceutical ("pharma") companies and other clients.

b.    Defendant ASHIK DESAI started working full-time at Outcome in approximately July 2013 as the Vice President of Business Growth and Analytics. He later held the titles of Executive Vice President of Business Operations and Chief Growth Officer.  He was placed on leave in October 2017.

c.    Executive A was Outcome's co-founder and Chief Executive Officer.

d.    Executive B was Outcome's President.  Executive B was branded as a co-founder of Outcome.

1

e.     Executive C was Outcome's Chief Operating Officer and Chief Financial Officer.

f.     Auditor A was an outside auditor that audited Outcome's 2015 and 2016 financial statements.

g.     During contract negotiations, a client, such as a pharma company, or the media agency negotiating on its behalf, typically sent Outcome a list of specific doctors that the client wanted to target with its proposed advertising campaign. The targeted doctors typically were high-prescribing doctors in the medical specialties likely to prescribe the clients' respective drugs. Outcome responded by confirming the number of targeted doctors and/or doctor's offices who were actually within its network. This was referred to as the "list-match" process.

h.     It was material to Outcome's clients that Outcome actually had in its inventory the doctors and doctor's offices that Outcome represented that it had during the list-match process, that Outcome ran the clients' advertisements on the number of TVs, tablets, and/or wallboards that were set forth in the contracts, that Outcome ran the clients' advertisements on the contracted number of devices during the entire time period set forth in the contract, that Outcome ran the clients' advertisements with the frequency set forth in the contract, that Outcome ran the clients' advertisements in the doctor's offices that Outcome represented it would during the list-match and contracting process, that Outcome met or exceeded any ROI guarantee set forth in a contract, that Outcome did not run competitors'

2

advertisements on the same devices if the contract so-provided, and that Outcome accurately reported patient engagement metrics for tablets.

      i.     Starting in 2013, DESAI performed list matches himself and, from 2014 onwards, supervised analysts who performed list matches.

      j.     Some of Outcome's contracts with its pharma clients contained return on investment ("ROI") guarantees, which meant that Outcome promised that for every dollar of advertising spent the advertising campaign would generate, for example, two or three dollars of additional revenue for the client. Outcome paid an outside company ("Measurement Company A") to conduct a study to determine whether the advertising campaign had met the ROI guarantee. Measurement Company A studied the campaign by comparing the prescribing behavior of doctor's offices exposed to the ads against a group of similar doctor's offices where the ads did not run.

      k.     During 2016 and 2017, Executive A and Executive C solicited venture capital funds and other investors to invest in Outcome. Executive A and Executive C caused investors to have access to a data room which contained, among other things, Outcome's financial statements for 2014 and 2015 and interim and final financial statements for 2016. Outcome's financial statements reflected its purported revenue and earnings, which were material to investors.

      l.     Between in or around March 2017 and in or around July 2017, approximately 20 investors invested approximately $487.5 million in Outcome.

3

2.    Beginning no later than in or around 2013 and continuing until at least in or around 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ASHIK DESAI,

defendant herein, along with Executives A, B, and C, and with others known and unknown, knowingly devised, intended to devise, and participated in a scheme to defraud Outcome's clients and investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.    It was part of the scheme that DESAI, Executive A, Executive B, and Executive C, in order to obtain millions of dollars from clients and to maintain the appearance of extraordinary revenue growth, knowingly and falsely represented to Outcome's clients that Outcome had in its network specific doctors and doctor's offices that the clients were targeting for advertising, lied to clients about how many screens the clients' advertisements were running on, and falsely inflated patient engagement metrics associated with Outcome tablets.  DESAI and his co-schemers' fraudulent conduct induced clients to contract with Outcome, resulted in material under-delivery on Outcome's advertising campaigns, caused clients to pay for advertising that was not delivered, and resulted in the material inflation of revenue in Outcome's financial statements.

4.    It was further part of the scheme that DESAI, Executive A, Executive B, Executive C and others sold and caused others to sell inventory to clients that

4

Outcome did not have. During the list-match process, when the clients sent Outcome a specific list of doctors that the client wanted to target with an advertising campaign, DESAI and others inflated the match by falsely representing that Outcome had in its network a higher number of doctors and doctor's offices on the clients' list than it actually had.

5.     It was further part of the scheme that when some clients asked not only for the number of doctors and number of doctor's offices that Outcome matched during a list match but also asked which specific doctors and doctor's offices had matched against Outcome's network, DESAI, Executive A, Executive B, Executive C and others who worked at their direction falsely indicated that certain offices and doctors were in Outcome's network when that was not true and on other occasions falsely claimed that Outcome could not provide the client with the list of doctors and offices due to privacy concerns.

6.     It was further part of the scheme that, as a result of DESAI, Executive A, Executive B, and Executive C's practice of selling and causing others to sell inventory to clients that Outcome did not have during the list-match process, Outcome under-delivered on its advertising campaigns. The under-delivery—which was the difference between the contracted number of screens or offices and the actual number of screens or offices in which Outcome was running the campaigns—was sometimes referred to as a "delta" or a "gap."

7.     It was further part of the scheme that despite the under-delivery on advertising campaigns, DESAI, Executive A, Executive B, and Executive C and

others working at their direction concealed the under-delivery from clients, in part by causing monthly affidavits to be sent to clients that falsely represented that Outcome had performed its contractual obligations by running advertisements on the contracted number of screens and offices. DESAI and his co-schemers also caused the clients to be invoiced as if the campaigns had run on the contracted number of screens and offices.

8. It was further part of the scheme that, after Outcome started to install tablets in exam rooms in approximately 2014, DESAI, Executive C and others working at their direction, with the knowledge of Executive B, provided clients with inflated patient engagement metrics regarding how frequently patients interacted with Outcome's tablets, including the number of clicks by patients.

9. It was further part of the scheme that DESAI and others, including Executive C, further concealed and caused to be concealed the extent of the under-delivery from Auditor A. When Auditor A audited Outcome's financial statements for years 2015 and 2016, it requested specific proof that Outcome had delivered on its obligations under the contracts with pharma clients. DESAI, in consultation with Executive C, instructed analysts to fabricate location lists to make it appear to Auditor A that Outcome had satisfied its contractual obligations. This concealment, along with additional concealment and deception, resulted in fiscal year 2015 and 2016 financial statements in which the reported revenue was materially inflated.

10. It was further part of the scheme that DESAI concealed the under-delivery and made it appear that Outcome's advertising campaigns were more

6

successful than they actually were by fraudulently altering key performance metrics in Measurement Company A reports prior to sending them to clients.

11.     It was further part of the scheme that Executive A and Executive C used the 2015 and 2016 financial statements, which contained materially inflated revenue numbers, to obtain approximately $487.5 million from investors between in or around March 2017 and in or around July 2017.

12.     It was further part of the scheme that DESAI and others misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the scheme and the purposes of those acts.

13.     On or about February 26, 2016, at Chicago, in the Northern District of Illinois, and elsewhere, defendant ASHIK DESAI, for the purpose of executing the scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email message from ASHIK DESAI to Executive C, which was routed through Google's computer servers located outside the state of Illinois, asking for Executive C's guidance on how to conceal the deltas on advertising campaigns from Auditor A;

In violation of Title 18, United States Code, Section 1343.

*Brian Hayes by MFM*

BRIAN HAYES
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515
Northern District of Illinois


ROBERT ZINK
Chief, Fraud Section

By:     *William Johnston*

William E. Johnston
Assistant Chief
Kyle C. Hankey
Trial Attorney
Criminal Division, Fraud Section