# EXHIBIT 1

Transcript of January 3-4, 2024 Hearing

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )    Docket No. 19 CR 864
 4                   Plaintiff,       )
                                      )    Chicago, Illinois
 5        v.                          )    January 3, 2024
                                      )    10:08 a.m.
 6   RISHI SHAH and SHRADHA AGARWAL,  )
                                      )
 7                   Defendants.      )

 8           TRANSCRIPT OF PROCEEDINGS - Evidentiary Hearing
                               Volume 1A
 9              BEFORE THE HONORABLE THOMAS M. DURKIN

10

     APPEARANCES:
11
     For the Government:      MR. MATTHEW F. MADDEN
12                           Assistant U.S. Attorney
                             219 South Dearborn Street, 5th Floor
13                           Chicago, Illinois 60604

14                           MR. WILLIAM E. JOHNSTON
                             U.S. Department of Justice
15                           Criminal Division, Fraud Section
                             1400 New York Avenue NW
16                           Washington, D.C.  20530

17
     For Defendant           MR. RICHARD E. FINNERAN
18   Shah:                   Bryan Cave Leighton Paisner LLP
                             One Metropolitan Square
19                           211 North Broadway, Suite 3600
                             St. Louis, Missouri 63102
20
     Also present:           MS. MAGGIE DePOY
21                           MS. HANNAH WISSLER

22   Court Reporter:         ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                             Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 1432
24                           Chicago, Illinois 60604
                             312.408.7782
25                           Elia_Carrion@ilnd.uscourts.gov
```

1    acknowledges that at most 30 percent of these assets were

2    traceable to the crime, and yet 7wire restrained all of it by

3    virtue of the government's excessive restraint and all on

4    dates after Ms. Poelking informed Mr. Madden that the -- that

5    7wire's assets were not entirely traceable.

6            Turning then to the August 13th email to Mr. Madden,

7    which, again, the Court is familiar with, here Ms. Poelking

8    indicated that:  "Our subjects and their companies made

9    investments in Guild and I2A with traceable funds, but there

10   were also investments in these entities that dated back to

11   2015 and 2013, respectively."

12           In other words, she is stating that there are assets

13   that were not traceable to either the April 2016 loan or the

14   2017 capital raise.  And note that one of the entities she

15   mentioned is Guild Capital.

16           Turning to the next slide, approximately two weeks

17   later, on September the 1st, 2023, Mr. Madden instructed Guild

18   to direct any proceeds from forthcoming distributions to an

19   escrow account.  This is an excerpt from that email where he

20   says:  "the purpose of the order is" --

21           MR. JOHNSTON:  Objection.  Misstates.  September 1,

22   2023, two weeks after an email in 2020?

23           MR. FINNERAN:  Oh, I apologize.  This -- the date, I

24   believe, should be September 2020, but I will go and confirm.

25   That's just a typo in the document, I believe.

1      THE COURT:  All right.

2      MR. FINNERAN:  I can confirm the actual date.

3      THE COURT:  All right.

4      MR. JOHNSTON:  Also objection to characterization of

5   the email.

6      THE COURT:  Well, this is opening statement, which is

7   really opening argument, and objection's overruled.

8      Go ahead.

9      MR. FINNERAN:  And again, Your Honor, if I'm mistaken

10  about the year of that, I will correct it, but I -- I believe

11  this was in September 2020.  If not, it was a year later.

12      But, in any event, it was an instruction,

13  nonetheless, of Mr. Madden, after receiving that information

14  from Ms. Poelking, that any interests in the investments with

15  Guild Capital should be held in an escrow account pending

16  further direction from the Court or from the government.

17      As a result of Mr. Madden's instruction, Guild

18  escrowed nearly 4 -- $9 million by the middle of January 2021

19  that Mr. Shah was denied access to.  This is a portion of a

20  record produced recently to us by Guild Capital.  That's a

21  cumulative total in the far right column.  And as you can see

22  there, even before January 12th, there had been more than

23  $5 million in distributions.  And by the end of January 12th,

24  we were up to nearly $9 million in distributions.  And

25  today -- not then, but today, the government acknowledges that

1  no more than 45.8 percent of these assets were traceable.

2  So from our perspective, there is no question that

3  the government was aware, through the emails that Ms. Poelking

4  provided, that there were nontraceable assets being

5  restrained, and, nonetheless, it not only allowed that

6  restraint to continue, it provided instructions to the

7  entities subject to that restraint not to disburse amounts to

8  Mr. Shah.

9  The next topic that we will focus on is counsel of

10  choice.  And the evidence in this case will show that Mr. Shah

11  could not afford to keep Bill Burck, his counsel of choice,

12  and Quinn Emanuel, as his chosen counsel given the assets --

13  given only the assets that were available to him outside the

14  protective order.

15  I know the government will contest that, but emails

16  showing referrals to other law firms, after this Court's

17  denial of Quinn's motion to amend, contemporaneously

18  demonstrate as much.  So a May 23, 2020, email from Mr. Burck,

19  which we will introduce into evidence, indicates that he was

20  referring Mr. Shah to a person named Jim Bennett, a lawyer I

21  actually know quite well, in St. Louis.  As you can see here,

22  Mr. Burck says:  "We've been representing him since right

23  before indictment.  The government has frozen most of his

24  assets.  We tried to get enough unfrozen to let us do the

25  case, but it didn't work.  He's got about $2 million to get

1    him through trial."

2          And I think you will see as we proceed that there are

3    explanations for why that is a roughly accurate understanding

4    of what Mr. Shah's actual liquidity was at the time that he

5    was asked to make a decision with respect to his attorneys.

6          It's important to understand, and we'll present both

7    testimony from Mr. Shah and expert testimony to help the Court

8    understand this difference, that the assets that were left

9    available to Mr. Shah were generally direct investments in

10   early-stage companies for which there was no available

11   secondary market.

12         In other words, it was not practical, despite efforts

13   to do so, for Mr. Shah to simply liquidate stock that he held

14   in a burgeoning company that had not yet achieved a large

15   valuation.

16         Meanwhile, the assets that were restrained by the

17   protective order were largely investments in funds for which

18   there is a vibrant secondary market and the likely opportunity

19   to liquidate assets.

20         And, indeed, Guild Capital, one of the entities I

21   just mentioned, has an agreement that specifically permits

22   transfers to other existing fund members.  As you can see

23   here, it says that under certain conditions members shall have

24   the right to transfer their units to a permitted transferee

25   without managerial approval.

1           And so had Mr. Shah had access to the nontraceable

2    assets at Guild, not only might have he been able to receive

3    the distributions that I mentioned a moment ago, but he could

4    also have sought to liquidate his position to either sell it

5    back to Guild or to another entity, and he could've made

6    similar attempts with respect to the other funds restrained by

7    the protective order in order to raise the funds to be able to

8    retain his counsel of choice.

9           In our prior oral arguments on this topic, I know the

10   Court raised the issue of what the real time was that the

11   parties had in order to identify their counsel.  And I will

12   only remind the Court that when it issued its order relating

13   to designation of counsel, the Court specifically indicated

14   that no extensions would likely be granted to any -- to the

15   date by which counsel must be designated.  And you will hear

16   testimony that it was the understanding of Mr. Shah that that

17   meant that he really did need to select a lawyer by June 30,

18   2020.

19           THE COURT:  The word "likely" is not considered?

20           MR. FINNERAN:  Your Honor, I believe that while the

21   word "likely" was considered, he believed and it was his

22   understanding that that was a serious indication that he

23   needed to select a lawyer by that date.

24           THE COURT:  Go ahead.

25           MR. FINNERAN:  Ultimately, Mr. Shah selected Hueston

opening statement - Johnston

58

1         Another thing you're going to learn, Your Honor --

2   and this is probably going to surprise you, because it

3   surprised us as well -- as a result of this hearing, we went

4   back and got more documents, including from Guild Capital, and

5   one of the things that we learned is that the monies returned

6   to Mr. Shah, almost all of them, came from a single

7   investment, three funds that were invested in a private

8   company called Ruggable.  And that --

9         THE COURT:  Called what?

10        MR. JOHNSTON:  Ruggable, R-U-G-G-A-B-L-E.  This was

11  an underlying company that the Guild Capital entities had

12  invested in.  And these were three separate investments.

13        What we discovered is that actually every single

14  incoming investment into a Guild vehicle that went -- that

15  bought Ruggable shares was 100 percent traceable.  Meaning

16  that the -- of the $9.5 million that has gone to Bryan Cave's

17  trust account, he was actually only entitled to approximately

18  1.1 million.  This hearing today is being funded with criminal

19  proceeds.

20        THE COURT:  By the way, you agreed to that, correct?

21        MR. JOHNSTON:  We did, and we made a mistake.  We

22  made a mistake, because there are Byzantine structures to

23  these investments.  The forfeiture order was -- that was

24  ultimately entered was correct.  It did say -- when -- what we

25  ultimately amended and what this Court approved was the all

1   right, title, and investment in the Guild Capital entity that

2   received this specific capital contribution on this date and

3   what was acquired by that capital contribution.

4          So actually what this Court has -- has ruled as

5   forfeitable captures that.  Now that's gone, we understand,

6   and we'll address that later whether there's anything left for

7   the Court.  But I want to go and bring this to your attention,

8   because it really blows up the defense argument that there's

9   all this money that but for the government's overbroad

10  restraint that would have flowed to Mr. -- Mr. Shah.  It's not

11  true.

12         THE COURT:  Well, does that affect whether or not it

13  was inaccurate, the original forfeiture allegation, at least

14  much of it?

15         MR. JOHNSTON:  It -- it did, yes.  So what it ended

16  up having -- we did, as a result, restrain other funds, but

17  those other funds were not nearly as profitable.  So when I

18  referred to the 1.1 million that was appropriately returned,

19  that comes from the other Guild entities that were wrongly

20  restrained because of the way we -- it was alleged or worded

21  in the protective order.  And so he has gotten that money back

22  appropriately.  But the Guild money -- sorry -- the Ruggable

23  money never should have been returned.

24         THE COURT:  Have you informed Mr. Finneran of this

25  when you discovered it?

opening statement - Johnston

1     MR. JOHNSTON:  We just learned about it two, three --

2    three days ago.

3          THE COURT:  All right.  Has he -- had he heard of it

4    until you just said it?

5          MR. JOHNSTON:  Well, he would have seen it on the

6    Guild production that we sent to him, and then it was on our

7    chart last night --

8          THE COURT:  Okay.

9          MR. JOHNSTON:  -- that was sent.

10         THE COURT:  A lot of fast-moving facts.

11         MR. JOHNSTON:  It was on your chart that we sent last

12   night that we -- but we just learned this a couple of days ago

13   ourself.

14         MR. FINNERAN:  Can I -- can I be heard very briefly,

15   Your Honor?

16         MR. JOHNSTON:  Can I just finish?

17         MR. FINNERAN:  Let him finish first?

18         THE COURT:  Yeah, please.

19         You're right --

20         MR. JOHNSTON:  So that's why --

21         THE COURT:  You're absolutely right.  It is a

22   surprise to me.

23         MR. JOHNSTON:  And it was a surprise to the

24   government as well.

25         So for these reasons, the -- the answer to whether

Poelking - cross by Johnston

1    information that you provided that ultimately went into the

2    protective order?

3    A.  My intent was only to restrain those pieces of the

4    investments.

5    Q.  You can take this down.

6            Now, I want to cover some new topics with you.  Do

7    you recall that you were shown a chart that you prepared

8    called Exhibit K?

9    A.  Yes.

10   Q.  Now, in preparation for this hearing today, were you asked

11   to do some revisions to that particular chart?

12   A.  I was.

13   Q.  And to prepare that chart, did you receive additional

14   records from many of the investment funds?

15   A.  I did.

16   Q.  And through those records, did you learn additional

17   details about whether some of the capital contributions that

18   you had traced went into a single investment vehicle or

19   multiple capital contributions went into -- let me rephrase my

20   question.

21           Did you learn additional details about the specific

22   investment vehicles that certain capital contributions you had

23   traced had gone into?

24   A.  Yes.

25   Q.  And did you also review declarations that had been

Poelking - cross by Johnston

1    A.   That's correct.

2    BY MR. JOHNSTON:

3    Q.   But in preparation for today, you got additional records.

4    And then can you explain why now we have so many more entities

5    for Guild Capital but, say, 7wireVentures fund is still just

6    one entity?

7    A.   Because the 7wire records that we received indicated that

8    the funds just went into, like, 7wireVentures fund; whereas,

9    Guild Capital was able to provide two very detailed

10   spreadsheets that showed the exact dates of the contributions,

11   the amounts, and then the ultimate payouts.

12   Q.   So each payout was connected to a specific investment

13   vehicle?

14   A.   That's what it looked like, yes.

15   Q.   And there were -- they detailed which contributions were

16   assigned to which investment vehicles?

17   A.   Correct.

18   Q.   And is there one thing -- is there an error that you

19   discovered in how one asset was identified --

20   A.   Yes.

21   Q.   -- in particular?

22   A.   Yes.

23   Q.   And what asset was that?

24   A.   It was the Chicago Ventures Fund.

25   Q.   Okay.  And so was Chicago -- were you on the -- 2068, you

Poelking - cross by Johnston

240

1    Q.  And in doing so, it tries to do it through two particular

2    chunks of time?

3    A.  Yes.

4    Q.  Okay.  And does it include the same -- does it include the

5    investments that were actually restrained by the protective

6    order?

7            MR. FINNERAN:  Objection, vague.

8            THE COURT:  Overruled.

9    BY THE WITNESS:

10   A.  Yes, this includes the assets in the protective order.

11   BY MR. JOHNSTON:

12   Q.  Now let's -- let's go and look at the second column.  If

13   we can just zoom in briefly.

14          Is this the -- can you explain what column has been

15   zoomed in on?

16   A.  Yeah.  This is a revision of what -- I mean, it's taking

17   the investments in the first column and showing how much was

18   traceable to the criminal proceeds.

19   Q.  And so why are there now four investments where there are

20   no funds that are traceable to criminal proceeds?

21   A.  Because in the last few weeks, when we've received

22   additional information and we were able to break out the

23   specific transfers to the funds and which investment vehicle

24   it actually went into, we were able to determine that they did

25   not invest in certain vehicles but they invested in others.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Elia E. Carrión*         *24th day of February, 2024*

_____     _____
*Elia E. Carrión*                *Date*
*Official Court Reporter*

*/s/ Sandra M. Tennis*      *24th day of February, 2024*

_____     _____
*Sandra M. Tennis*              *Date*
*Official Court Reporter*

248

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )   Docket No. 19 CR 864
4                  Plaintiff,       )
                                    )   Chicago, Illinois
5          v.                       )   January 4, 2024
                                    )   10:58 a.m.
6  RISHI SHAH and SHRADHA AGARWAL,  )
                                    )
7                  Defendants.      )

8         TRANSCRIPT OF PROCEEDINGS - Evidentiary Hearing
                          Volume 2
9           BEFORE THE HONORABLE THOMAS M. DURKIN

10  APPEARANCES:

11  For the Government:    MR. MATTHEW F. MADDEN
                           Assistant U.S. Attorney
12                         219 South Dearborn Street, 5th Floor
                           Chicago, Illinois 60604
13
                           MR. WILLIAM E. JOHNSTON
14                         U.S. Department of Justice
                           Criminal Division, Fraud Section
15                         1400 New York Avenue NW
                           Washington, D.C.  20530
16

17  For Defendant          MR. RICHARD E. FINNERAN
    Shah:                  Bryan Cave Leighton Paisner LLP
18                         One Metropolitan Square
                           211 North Broadway, Suite 3600
19                         St. Louis, Missouri 63102

20  Also present:          MS. MAGGIE DePOY
                           MS. HANNAH WISSLER
21
    Court Reporter:        ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
22                         Official Court Reporter
                           United States District Court
23                         219 South Dearborn Street, Room 1432
                           Chicago, Illinois 60604
24                         312.408.7782
                           Elia_Carrion@ilnd.uscourts.gov
25

249

```
 1   APPEARANCES (continued:)

 2   For Defendant          MR. JOHN D. CLINE
     Agarwal:               Law Office of John D. Cline
 3                          235 Montgomery Street, Suite 1070
                            San Francisco, California  94104
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    order by the Court several years ago, there was a belief by

2    the parties that some of the monies were frozen that were not

3    proceeds of criminal activity.

4         That occasioned the -- at least one of the motions

5    that related to the Sixth Amendment issue, among others, but

6    the primary one, the Sixth Amendment issue, that we've been

7    litigating here through -- both through briefs and starting

8    with testimony yesterday.

9         Because of the fact that some of the monies that were

10   returned once the parties had -- believed that some -- that

11   some of the originally frozen money was not

12   criminally-derived, monies were returned over the summer and

13   they were used to finance some of the defense involved in this

14   case.

15        The government's position now that some of those

16   monies were improperly returned -- improperly's the wrong

17   word -- incorrectly returned, and their belief through

18   Ms. Poelking's -- in part through what Ms. Poelking was

19   testifying about, that some of those funds that were returned

20   were, in fact, from an originally criminally-derived source

21   may have to be returned or clawed back, or at least there has

22   to be litigation about that, which may involve issues of

23   estoppel and detrimental reliance and any other number of

24   issues.  But, nonetheless, it raises issues where defense

25   counsel believes those issues and any potential conflicts

1  relating to it have to be resolved before they can continue to

2  proceed to represent Mr. Shah.

3          Mr. Cline, on behalf of Ms. Agarwal, has correctly

4  stated that he has -- although he independently is

5  representing Ms. Agarwal -- he is also relying, in part, on

6  Mr. Finneran and his colleagues' representation of Mr. Shah

7  when he is representing Ms. Agarwal, because the arguments

8  that Mr. Shah's been making have been adopted by Ms. Agarwal

9  in large part.

10          So for all those reasons, we're going to have to wait

11  until these issues, these potential conflict issues and other

12  issues that have arisen from what the government said

13  yesterday, are resolved.  So we're going to have to vacate --

14  or recess this hearing until there has been some resolution of

15  that.

16          Anything else I need to put on the record relating to

17  this issue?  First, from the government?

18          MR. MADDEN:  No, Your Honor.

19          THE COURT:  From defense?

20          MR. FINNERAN:  Not on -- not on behalf of Mr. Shah,

21  Your Honor.

22          MR. CLINE:  No, Your Honor.

23          THE COURT:  Okay.  So we'll recess this hearing.

24          I would expect you to be in touch with me promptly as

25  to next steps you're all taking so that we can reconvene this

1    hearing and continue with this.

2           I don't know how this affects the sentencing date.

3    I'm not vacating it at this time, but I do want to -- so I

4    want you to act promptly on the various issues you said you'd

5    address when we were back in chambers.

6           MR. FINNERAN:  Yes, Your Honor.

7           THE COURT:  All right.  Thank you all.

8       (Proceedings concluded at 11:02 a.m.)

9                              CERTIFICATE

10      I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12   */s/ Elia E. Carrión*          *24th day of February, 2024*

13   _____    _____
     *Elia E. Carrión*                      *Date*
     *Official Court Reporter*
14

15

16

17

18

19

20

21

22

23

24

25