**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RISHI SHAH, SHRADHA AGARWAL, BRAD PURDY, AND ASHIK DESAI | No. 19 CR 864<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendants Rishi Shah, Shradha Agarwal, Brad Purdy, and Ashik Desai were convicted of various offenses in connection with their engagement in a multi-year, multi-million-dollar fraud scheme at Outcome Health. Shah and Agarwal raised several challenges to their convictions on appeal, and the Seventh Circuit affirmed. Pending before the Court is what, if any, restitution is owed to the victims of Defendants' crimes. For the reasons stated herein, the Court finds restitution is owed to the investor victims and six lender victims, but not Company A or the customer victims. This opinion also states the reasons for the Court's order on the motion to quash. By September 4, 2026, the parties are to submit a calculation of the restitution owed to three of the lender victims consistent with this opinion and a proposed briefing schedule on the issue of allocation.

## Background

In late June 2024, the Court held sentencing hearings for Shah, Agarwal, and Purdy. *See* R. 785, 794, 797, 798.[1] The Court entered judgment against those Defendants and deferred the determination of restitution pending a hearing, which the Court set for the first week of September 2024.[2] R. 813, 818. Ahead of the hearing, the parties filed written submissions with their respective positions on restitution. *See* R. 854, 870. The Court also denied the Government's motion to permit the London-based witness from victim Goldman Sachs ("Goldman"), Ravi Gupta, to testify by videoconference. R. 864.

The hearing proceeded on September 4, 2024 with opening statements and testimony from the Government's expert Josh Johnston.[3] The Court sentenced Desai on September 19, 2024,[4] R. 885, and the restitution hearing continued on October 2, 2024, during which the Court heard testimony from the defense's expert Carl Saba and additional testimony from Johnston. Saba and Johnston had previously testified

[1] Citations to the transcripts from the hearings, docketed at ECF Nos. 848, 849, 850, and 851, are referred to as "Sentencing Tr."

[2] All parties (except for Desai, who had not yet been sentenced at the time of the stipulation) waived any rights afforded under Section 3664(d)(5) to have a final determination of restitution completed within 90 days of sentencing, and explicitly agreed that the Court could make a restitution determination after the 90-day time period set forth in Section 3664(d)(5). *See* R. 880.

[3] Citations to the transcripts from the restitution hearing docketed at ECF Nos. 889, 896, 906, and 907 are referred to as "Tr."

[4] Between July and September 2024, Shah also filed a motion for bail pending appeal, which was granted after oral argument; Agarwal filed an unopposed motion to stay her term of supervised release pending appeal, which was granted; and three third parties filed a petition for relief from forfeiture, which was stayed pursuant to a joint motion.

during the sentencing hearings. The parties submitted several expert reports in connection with their testimony at sentencing and the September 4th and October 2nd hearings. R. 756-1, 787, 870-1, 936.[5] The restitution hearing continued on October 24 and 25, 2024, during which the Court heard additional testimony from Johnston and testimony from Gupta. At the conclusion of the hearing, Shah's counsel indicated that he would need additional time to consider whether to pursue the production of a "modeling document" referenced by Gupta during his testimony. Tr. 773.

On November 7, 2024, the Court held a telephone conference with the parties. R. 901, 914. The Court orally ruled that no restitution would be ordered as to pharmaceutical company customers, with the reasons to be included in a written opinion to follow. The parties also reported some effort to reach agreement on the remaining restitution issues, and counsel for Shah stated that discussions with Goldman to obtain additional documents were ongoing. On November 13, 2024, the Government filed an updated position regarding restitution to lender victims, R. 903, and on November 15, 2024, the Court convened another telephone conference to discuss next steps, R. 904, 905. The parties reported that an agreed resolution of the remaining restitution issues was unlikely, and Shah's counsel stated that discussions with Goldman about the production of documents were ongoing. The Court gave defense counsel leave to issue a subpoena, and asked for the parties to jointly submit

[5] An additional report from Saba was admitted into evidence as Shah 9075 but not filed on the docket.

a status report on whether any further proceedings were required once defense counsel received the documents.

Six weeks later, at the Court's request, the parties jointly filed a status report. R. 910. Shah's counsel reported that Goldman made a production on November 22, 2024; that Goldman stated that it would not produce additional documents and would move to quash any subpoena; and that Shah's counsel sent a subpoena on December 27, 2024. *Id.* The parties disagreed on next steps. Defendants asked the Court to terminate proceedings without ordering restitution because the Goldman production litigation would unduly prolong the proceedings so as to outweigh the need for restitution to the investors and lenders. *Id.* at 4–5. Defendants reiterated this position in a motion to terminate restitution proceedings filed on January 1, 2025. R. 911. The Government asked the Court to terminate the proceedings and determine the amount of restitution based on the current record. R. 910 at 4; R. 915.

The Court convened a telephone conference with the parties and counsel for Goldman on January 28, 2025, during which the Court set a briefing schedule on Goldman's anticipated motion to quash and a deadline for defense counsel to file a summary of what Goldman had produced to date. R. 919. On February 13, 2025, the Court granted the motion to quash, with reasons to follow in a written opinion. R. 932. The Court also gave the parties a week to set a date for any additional testimony from Gupta and complete the written record. *Id.* Defendants thereafter filed a response to the Government's updated lender position. R. 934. On March 3, 2025, the

Court heard additional testimony from Gupta by videoconference, and the Court allowed the parties to file supplemental materials. R. 945.

In April 2025, Defendants asked the Court to terminate restitution proceedings because Gupta's testimony was an unreliable basis for a restitution order or alternatively grant them leave to issue subpoenas to certain third parties to obtain communications related to the investors' outlook prior to the settlement. R. 955. The Court granted the request to issue subpoenas, R. 960, and Defendants received and reviewed documents from PatientPoint, Goldman, and CapitalG over the next four months. R. 971, 973, 975, 977, 981, 984.

In October 2025, Defendants moved to supplement the restitution record with the new materials and renewed their motion to terminate restitution proceedings or alternatively grant them leave to issue more subpoenas to obtain internal discussions regarding the valuation of Outcome in connection with settlement that the subpoenaed parties were withholding and documents related to the 2025 sale of PatientPoint. R. 989, 990. The Court orally granted in part and denied in part those requests on December 5, 2025. R. 997, 998. The Court allowed Defendants to supplement the record, and denied the motion and renewed motion to terminate restitution proceedings for the reasons stated in this opinion. R. 998 at 5. The Court further permitted Defendants to issue subpoenas to the investors on their valuation of Outcome in connection with the settlement, but denied the request to issue subpoenas on the 2025 sale of PatientPoint. *Id.* at 26–31.

The subpoena effort continued through May 2026. *See* R. 1005, 1007, 1011, 1014, 1018, 1023, 1028, 1031, 1038. In the interim, Defendants moved to terminate the restitution proceedings in light of *Ellingburg v. United States*, 607 U.S. 163 (2026), R. 1009, 1017, 1026, and the parties filed supplemental briefs on the renewed motion to terminate restitution proceedings, R. 1033, 1040. On May 4, 2026, the Court closed discovery and briefing on restitution. R. 1041, 1042.

**Legal Standard**

The Mandatory Victims Restitution Act ("MVRA") requires courts to order defendants convicted of certain crimes to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). "The purpose of the MVRA is to ensure victims are compensated for the full amount of their losses caused by a defendant's criminal conduct." *United States v. Betts*, 99 F.4th 1048, 1060–61 (7th Cir. 2024).

The statute defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). To determine whether a victim's losses are "directly and proximately" caused by the offense of conviction, the Court looks to both cause-in fact (but-for causation) and proximate cause. *Betts*, 99 F.4th at 1061. As to but-for causation, "a defendant's conviction must have been a necessary factor in bringing about the victim's harm." *Id.* As to proximate causation, "the harm alleged must have a sufficiently close connection to the conduct, which is evaluated based on whether the harm was 'foreseeable' to a defendant. *Id.* (quoting *Robers v. United States*, 572 U.S. 639, 645 (2014)).

"An order of restitution for property loss must require the defendant to return the property to the victim or to return the value of the property minus 'the value (as of the date the property is returned) of any part of the property that is returned.'" *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014) (quoting 18 U.S.C. § 3663A(b)(1)(A)(ii)). "The Government must establish the restitution amount by a preponderance of the evidence." *United States v. Griffin*, 76 F.4th 724, 750 (7th Cir. 2023) (citation omitted). A defendant has the burden of proving any "offset" or "setoff" to the restitution amount "because he knows best what he returned to the victim." *United States v. Anderson*, 866 F.3d 761, 765 (7th Cir. 2017) (citing *Malone*, 747 F.3d at 486). District courts have "broad discretion to determine the procedures for calculating the amount of restitution." *United States v. Hassebrock*, 663 F.3d 906, 925 (7th Cir. 2011).

**Discussion**

I. *Ellingburg*

As a threshold matter, Defendants argue that the Supreme Court's recent decision in *Ellingburg* bars the imposition of restitution in this case. In *Ellingburg*, the Supreme Court held that restitution is a criminal punishment, not a civil remedy. 607 U.S. at 166. In Defendants' view, under the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Sixth Amendment thus requires the amount of restitution to be proved to a jury beyond a reasonable doubt. Because, in this case, the facts needed to support restitution were not found by the jury beyond a reasonable doubt, Defendants say, restitution cannot be imposed.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000), the Seventh Circuit held that *Apprendi* does not apply to restitution under the MVRA on two independent bases: (1) restitution is a civil remedy, not a criminal penalty; and (2) the MVRA "does not include a 'statutory maximum' that could be 'increased' by a given finding." The "civil remedy" rationale is no longer good law in light of *Ellingburg*. However, the "no statutory maximum" rationale remains binding precedent and has been repeatedly reaffirmed by the Seventh Circuit. *See United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006); *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005); *see also United States v. Bonner*, 522 F.3d 804, 807 (7th Cir. 2008) (citing *Belk*).

Defendants argue that *Southern Union Co. v. United States*, 567 U.S. 343 (2012) discredited the no statutory maximum rationale. In *Southern Union*, the Supreme Court held that "*Apprendi* applies to the imposition of criminal fines." 567 U.S. at 359. The statute at issue prescribed a maximum fine of $50,000 for each day of violation. *Id.* at 347. The Supreme Court found that the fine imposed by the district court, which substantially exceeded the $50,000 fine supported by the jury's verdict, violated the Sixth Amendment. The Court explained:

> [T]he amount of a fine, like the maximum term of imprisonment or eligibility for the death penalty, is often calculated by reference to particular facts. Sometimes, as here, the fact is the duration of a statutory violation; under other statutes it is the amount of the

> defendant's gain or the victim's loss, or some other factor. In all such cases, requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum amount is necessary to implement *Apprendi*'s "animating principle": the "preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense." In stating *Apprendi*'s rule, we have never distinguished one form of punishment from another. Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal "sentences," "penalties," or "punishments"—terms that each undeniably embrace fines.

*Id.* at 349–50 (cleaned up).

*Southern Union* does not upend the Seventh Circuit's no statutory maximum rationale. Its holding is limited to the imposition of criminal fines. The Supreme Court did not address restitution. To the contrary, the Court explicitly recognized that there cannot "be an *Apprendi* violation where no maximum is prescribed." *Id.* at 353. And unlike the criminal fines statute at issue, the MVRA does not set any maximum penalty. *Behrman*, 235 F.3d at 1054.

Nor has the Seventh Circuit abandoned the no statutory maximum rationale in the face of *Southern Union*. In *United States v. Wolfe*, 701 F.3d 1206, 1216–17 (7th Cir. 2012), the Seventh Circuit held that *Apprendi* did not apply because restitution was not a criminal penalty and declined to reach the question of whether *Southern Union*'s holding regarding criminal fines should extend to restitution. The Seventh Circuit went one step further in *United States v. Gustafson*, 130 F.4th 608, 618 n. 22 (2025), explaining that even if the Court were to consider restitution a criminal penalty, it would still conclude that the restitution order did not violate the Sixth Amendment. The Court cited with approval *United States v. Green*, 722 F.3d 1146, 1149–51 (9th Cir. 2013), in which the Ninth Circuit relied in part on the no statutory

maximum rationale in declining to overrule its longstanding precedent that *Apprendi* does not apply to restitution in light of *Southern Union*.

Indeed, since the Supreme Court's decision in *Southern Union*, numerous Courts of Appeals have reaffirmed the no statutory maximum rationale in declining to overrule their prior precedent and extend *Apprendi* to restitution. *United States v. Vega-Martinez*, 949 F.3d 43, 55 (1st Cir. 2020); *United States v. Bengis*, 783 F.3d 407, 413 (2d Cir. 2015); *United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012); *United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014); *United States v. Churn*, 800 F.3d 768, 781–82 (6th Cir. 2015); *Green*, 722 F.3d at 1150–51; *United States v. Kachkar*, No. 19-12685, 2022 WL 2704358, at *10 (11th Cir. July 12, 2022).[6]

Similarly, post-*Ellingburg*, courts across the country have uniformly held that *Apprendi* does not apply to restitution because it has no statutory maximum. *See United States v. Kim*, No. 21-CR-00164-CRB-1, 2026 WL 2059080, at *2 (N.D. Cal. July 16, 2026); *United States v. Scott*, No. CR 14-10074-NMG, 2026 WL 1878316, at *1 (D. Mass. June 30, 2026); *United States v. Shetty*, No. 2:23-CR-00084-TL, 2026 WL 1593335, at *4 (W.D. Wash. June 3, 2026); *United States v. Alexander*, No. 4:22-CR-00169-JAR-1, 2026 WL 835779, at *2 (E.D. Mo. Mar. 26, 2026); *United States v. Zafaranchi*, No. CR22-0122-JCC-1, 2026 WL 658435, at *2 (W.D. Wash. Mar. 9, 2026); *see also United States v. Katz*, No. 25-981, 2026 WL 1952743, at *2 (9th Cir. July 1, 2026) (declining to overturn circuit precedent that *Apprendi* does not apply to

[6] In *United States v. Printz*, 594 F. App'x 883, 886 (7th Cir. 2015), the Seventh Circuit cited several of these cases in noting that "all other circuits that have analyzed *Southern Union* agree that this decision does not extend *Apprendi* to restitution."

restitution under the MVRA because *Ellingburg* was not clearly irreconcilable with *Green*).

In Defendants' view, all of these courts misapplied *Blakely v. Washington*, 542 U.S. 296, 303 (2004). In *Blakely*, the Supreme Court explained that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." 542 U.S. at 303 (emphasis in original). According to Defendants, because the jury did not make findings as to the amount of the victims' losses, the statutory maximum for restitution in this case is zero. Defendants find support for this view in Justice Gorsuch's dissent from the denial of certiorari in *Hester v. United States*, 586 U.S. 1104 (2019) and two out-of-circuit dissents—none of which are precedential.[7] The state of the law in the Seventh Circuit, post-*Blakely*, is that restitution has no statutory maximum such that *Apprendi* does not apply. *Bonner*, 522 F.3d at 807; *Belk*, 435 F.3d at 819; *George*, 403 F.3d at 473. Therefore, *Ellingburg*, which has no bearing on the Seventh Circuit's no statutory maximum rationale, does not foreclose the imposition of restitution in this case. The motion to terminate restitution proceedings on this basis, R. 1009, is denied.

[7] *See Hester*, 586 U.S. at 1107 (stating that, based on *Blakeley*, the "statutory maximum for restitution is usually *zero*" and "it would seem to follow that a jury must find any facts necessary to support a (nonzero) restitution order"); *United States v. Carruth*, 418 F.3d 900, 906 (8th Cir. 2005) (Bye, J., dissenting); *United States v. Leahy*, 438 F.3d 328, 339 (3rd Cir. 2006) (McKee, J., concurring in part and dissenting in part). Justice Sotomayor joined Justice Gorsuch's dissent from the denial of certiorari in *Hester* but not his similar dissent from the denial of certiorari in *Rimlawi v. United States*, 145 S. Ct. 518 (2025).

II. Complexity Exception

Defendants also ask the Court to apply the MVRA's "complexity exception" and decline to order restitution to any of the victims. "If determining complex issues of fact related to causation would unduly 'complicate or prolong the sentencing process,' the MVRA allows, but does not require, the district court to choose not to award restitution." *Betts*, 99 F.4th at 1061 (quoting 18 U.S.C. § 3663A(c)(3)(B)). This exception requires a balancing test: the Court "must weigh the need to provide restitution to a victim against the burden on the sentencing process posed by determining complex issues of fact." *Malone*, 747 F.3d at 486.

Here, with one exception as to the pharmaceutical company victims addressed below, the need to provide restitution to the victims of the years-long fraud at Outcome outweighs the burden posed by the relevant fact issues. Certainly, determining restitution in this case is more difficult and complex than it would be in, say, a bank robbery case. But the same could be said for nearly every white-collar fraud case. In this Court's view, where the victims' losses are of the magnitude they are here, that relative complexity is not a valid reason to refuse to award restitution. And while the restitution proceeding was longer than anticipated, the Court entered final judgments some time ago, and Shah and Agarwal's convictions have been affirmed. *Cf. United States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013) (affirming entry of restitution where the district court took 18 months to determine restitution in securities fraud scheme).

Defendants argue that determining restitution in this case is "largely an academic question" because Shah and Agarwal have forfeited upwards of $100 million to the Government, which the Government can provide to the victims through the remission process. R. 912 at 6, 7–8 (citing 28 C.F.R. § 9.8). As an initial matter, the Government contests the claimed valuation of the forfeited assets. Regardless, the MVRA requires the Court to order Defendants to make restitution to the victims, assuming the Government has met its burden. Whether the Government ultimately remits forfeited property to petitioning victims is beside the point. Disregarding a well-developed record on restitution and deferring to the possibility of remission at this stage only serves to further complicate the remaining proceedings in this matter. The motion to terminate restitution proceedings as unduly complex is denied except as to the pharmaceutical company victims, as discussed below.

## III. Restitution

The Government initially asked for an order requiring Defendants to pay a total of $536,235,3761.64 in restitution for investor, lender, and pharmaceutical company victims. R. 854. The Government subsequently modified its position as to the lenders. R. 903. The Court addresses each category of victims in turn.

### a. Investor Victims

The Government seeks $456,487,171.50 in restitution to the investor victims. That figure derives from the $487,487,171.50 the victims paid in 2017 for their investment in Outcome, less the $31 million that Shah and Agarwal returned to investors as part of the February 1, 2018 settlement.

Defendants argue that the Government has not met its burden of establishing the restitution amount. According to Defendants, the Government was required to: (1) establish what, if any, losses the investors suffered as a result of the fraud by determining the difference between the actual value of Outcome on the date of their investment and the price the investors paid for it; (2) offer evidence connecting that difference in value to fraud; and (3) ascertain whether those losses still exist today. *See* R. 912 at 10. Defendants maintain that the investors did not suffer any losses from the fraud because of the structure of their investment. Defendants explain that the investors had a fixed claim, which equaled their investment plus an agreed rate of return. Thus, the investors would have only suffered a loss if the value of Outcome dropped below the value of that fixed claim, and according to Saba, it didn't.

Much of the parties' disagreement turns on their competing interpretations of *Robers*. *Robers* was a mortgage fraud case. The victim banks lent Robers money for the purchase of two houses based on his fraudulent loan applications. *Robers*, 572 U.S. at 641. When he failed to make payments, the banks foreclosed on the mortgages, took title to the houses, and later sold them. *Id.* Robers argued that the sentencing court miscalculated his restitution obligation. *Id.* at 642. According to Robers, the court should have reduced restitution by the value of the collateral at the time the banks took title to it. Due to the declining real estate market, by the time the banks sold the houses, they were worth less than when the banks took possession of them. The Supreme Court rejected that argument. Focusing on the language of 18 U.S.C. § 3663A(b)(1), the Court held that the statutory phrase "any part of the property" refers

only to the specific property the banks lost (the money lent to Robers), not the collateral the banks received (the houses). *Id.* at 641–42. Accordingly, "no 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale." *Id.* at 641 (quoting 18 U.S.C. § 3663A(b)(1)).

*Robers* illustrates the proper analytical framework for restitution under the MVRA to the investor victims in this case. The Court starts with "the property" lost as a result of Defendants' fraud. In *Robers*, the property lost was the money lent, not another amount that depended on the value of the collateral. *See also United States v. Holmes*, 163 F.4th 547, 576–77 (9th Cir. 2025) (applying *Robers* to investor fraud case and explaining that for restitution to investors, the property lost by investors was the money they invested into the company). So too here, the property lost is the $487.5 million the investors were defrauded into paying for their investment in Outcome, not some other amount that depends on the value of Outcome.

Next, the Court considers "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii). In *Robers*, that was the money returned to the banks when they sold the collateral, not the value of the collateral when the banks took title to it. In this case, the property returned is the $31 million returned to the investors by Shah and Agarwal in the February 2018 settlement, not the value of the investment in Outcome when the investors were defrauded into making it.

Finally, the Court considers whether some additional offset is appropriate under other provisions of the MVRA. *Robers* considered a situation where a victim is

unable to sell the collateral by the time of sentencing, "thus depriving the defendant of credit against his restitution obligation for the value of the collateral." *United States v. Ghuman*, 966 F.3d 567, 579 (7th Cir. 2020). The Supreme Court pointed out that courts have several tools to address the potential unfairness to a defendant in such a scenario, namely "delaying the determination of the restitution amount for a short period of time following sentencing in order to give the victim additional time to liquidate the collateral or crediting the defendant for the value of the collateral if the victim has decided to keep it." *Id.* (citing *Robers*, 572 U.S. at 644); *see also Holmes*, 163 F.4th at 577 (holding that the district court should have considered possible credits to defendants' restitution obligation for the residual value of investor victims' Theranos shares after the fraud came to light).

The Government acknowledges that if Defendants show that the investors decided to hold onto their investment in Outcome, then the Court can credit the value of the investment at the time of that decision. R. 889 at 18; R. 915 at 12. The Government argues, however, that Defendants have not made such a showing, and even if they have, their proposed offset value is unreliable.

Here, Defendants set forth sufficient evidence to show that investors made a business decision to hold onto their interest in Outcome as part of the February 2018 settlement. Shortly after the publication of the Wall Street Journal article revealing the fraud, Goldman and other investors sued Outcome, Shah, and Agarwal in New York state court. In determining how to move forward, Goldman reviewed financial information and spoke to the experts it had previously consulted in making its

original investment in Outcome. Tr. 626–28; *see also* R. 989-1; R. 994-1; R. 994-2. Through that process, Goldman came to believe that while there would be a "setback" and likely short-term revenue decline given customer departures and the reputational hit from the fraud, Outcome's business model was sound, there was real demand for it in the market, and with an injection of liquidity and new leadership, the company could pay down its debt, survive a period of cash burn, win back customers, and grow. Tr. 617, 700–01; *see also* R. 945 at 12 (Goldman "believed at the time that notwithstanding th[e] exogenous factors and the alleged internal practices, the business model remained fairly attractive"), 32. As part of the settlement, Shah and Agarwal returned $190 million, which included $31 million paid back to investors and $159 million reinvested into Outcome, of which $77 million was used to pay down debt obligations. Tr. 707. The investors also decided to hold onto and restructure their investment in order to achieve greater benefit from Outcome's future growth. *Id.* at 707–09 (describing original and new investment structures); *see also id.* at 763 (Goldman believed it was "more likely to recover more money and possibly even turn a profit if [it] stayed in the business, reinvested, got more control, turned the thing around" rather than liquidating its position).

Having found that the investors decided to retain their interest in Outcome in February 2018, the next question is what the offset for the value of that interest should be. The parties offer competing valuations of the investors' equity and the total gain or loss through their respective experts: Josh Johnston for the Government and Carl Saba for the defense.

There are several similarities between Saba and Johnston's analyses. Both followed the same general steps to reach an equity valuation and loss figure. First, they calculated the fair market value ("FMV") of Outcome as of October 13, 2017 by applying different valuation methodologies under the income and market approaches at certain weights. Second, they rolled forward the FMV from October 13, 2017 to February 1, 2018 based on monthly losses and the cash returned in settlement. Third, they applied an Option Pricing Model ("OPM") to determine the value of the investors' equity under the post-settlement structure. And fourth, they subtracted the invested principal and added back the $31 million in cash received in the settlement to determine total loss.

There are also many similarities in the inputs and assumptions the experts used in conducting this four-step analysis. Both experts used the Discounted Cash Flow ("DCF") and Guideline Public Company ("GPC") methodologies. The DCF methodology determines the value of a company by applying a discount rate to projected future cash flows. The GPC methodology determines the value of a company based on the valuation multiples of peer companies or "comparables." Additionally, both experts assumed the same revenue forecast for AccentHealth and Synergistic Revenue percentages; applied actual net operating losses through October 2017 against future tax liabilities; relied on the same historical income statement and balance sheet; and made the same revenue overstatement adjustment based on Michael Petron and Gibson Dunn's analyses. Both experts also applied the same

monthly adjustments to roll forward the FMV to February 1, 2018 and utilized a Black-Scholes OPM to calculate the value of the investors' equity.

Despite these similarities, Johnston and Saba reached very different conclusions about the value of the investment at the time of settlement. Saba said the value of the investors' equity as of February 1, 2018 was $483.3 million, while Johnston said it was $132.9 million or $149.1 million, based on his two revenue cases. R. 756-1 ¶ 123; R. 936 ¶ 128. Applying those values, Saba ended up with a loss figure of $0 (in fact, he calculated a gain of $26.6 million), and Johnston generated loss figures of $307.6 million and $323.7 million. R. 756-1 ¶ 123; R. 936 ¶ 129.

Many differences contribute to this disparity. As one example, Saba used the DCF and GPC methodologies weighted at 66.7% and 33.3% respectively, while Johnston used the DCF and GPC methodologies, weighted at 50% and 25% respectively, along with the Guideline Transaction ("GT") methodology, weighted at 25%.[8] Tr. 106; R. 936 ¶ 87. But three key differences account for most of the gap.

The first is the revenue forecasts. The forecasts are the starting point for calculating the cash flows in the DCF analysis, and revenue and EBITDA are inputs in the GPC analysis. Saba used the forecasts developed by Outcome's management before the revelation of the fraud, including for 2017, but delayed them by approximately one year and adjusted for overstated revenue in 2016. Tr. 400–02, 484. In contrast, Johnston created two different forecasts. He started with actual revenue

---

[8] The GT methodology determines the value of a company based on valuation multiples from transactions of similar companies.

through mid-October 2017, reduced by the overstated revenue. *Id.* at 107, 490–92. Case A ("No Revenue Decline") assumed that revenue would not decline in 2018 and then gradually return to its historical peak over the following four years. *Id.* at 100–01, 108–10, 484–85. Case B ("Revenue Decline") assumed that revenue would decline by 50% in 2018 and then gradually return to the 2013-2017 average growth rate. *Id.* at 100–01, 108–10, 484–85. The following graph shows how the experts' revenue forecasts and actual revenues compare:




R. 915 at 17.

The second key difference is the discount rate used in the DCF analysis. Saba used a discount rate of 20%, whereas Johnston used a discount rate of 27.6%. Tr. 250. That difference comes from the different ways the experts accounted for unsystematic risk. Saba used a company-specific risk premium ("CSRP"), which was determined based on "appraiser judgment" rather than market data. *Id.* at 514; Sentencing Tr.

at 179, 269. Saba applied a "very high" CSRP of 10, to capture the "substantially elevated risk profile." Sentencing Tr. at 178. Johnston did not apply a CSRP but instead multiplied the unlevered beta by a volatility adjustment, which was derived by comparing the volatility of the comparables to the volatility of the market as a whole. Tr. 174, 514–15.

The third key difference is the selection of comparables, which affects both the DCF and GPC methodologies. Saba selected 22 comparables across three groups: (1) video streaming companies, (2) advertising firms including outdoor advertising and billboard companies, and (3) the large, high-growth technology companies included in the Goldman December 2016 investor presentation (e.g., Meta, Alphabet, Zillow, and Yelp) ("Group 3"). R. 756-1 ¶ 92. Johnston selected 11 comparables, five of which overlapped with Saba. R. 936-1 at ¶ 113. Johnston did not select any of the Group 3 companies.

Saba and Johnston critiqued each other's analyses. Johnston disagreed with Saba's use of forecasts developed by Outcome management (including Purdy) before the revelation of the fraud without adjusting for the go-forward impact of customer defections and revenue misses in 2017. Tr. 60–66. He also took issue with Saba's application of a 2-3% increase in the subjective CSRP to account for the impact of the fraud and use of large, high-growth technology companies as comparables. *Id.* at 65–66, 71–73. Johnston stated that if Saba had used actual revenue in the year before October 2017, his GPC value would have decreased by $400 million, and excluding Netflix and the other Group 3 entities from Saba's analysis would have decreased the

GPC value by $240 million. *Id.* at 72, 74–75. In Saba's view, Johnston forecasted "excessively high" capital expenditures ("CapEx"); applied the "novel and unsupported" volatility adjustment to beta; failed to remove the impact of the AccentHealth acquisition; relied on highly distinguishable fraud cases to develop the revenue forecasts; and had an overly pessimistic view of post-fraud growth assumptions. *Id.* at 284. Saba explained that correcting for CapEx and beta would reduce Johnston's loss figure to $100.3 million and $122.5 million under the two cases. *Id.* at 287; Appendix.[9] Further adjusting for the AccentHealth acquisition would reduce Johnston's loss figures to $67.9 million and $94.8 million. Tr. 287; Appendix.

Saba and Johnston also defended their analyses against each other's critiques. Johnston maintained that his revenue forecasts were not overly pessimistic because they were still significantly higher than actual revenue and consistent with both historical results and Goldman's valuation. Tr. 485–91, 494–97. Johnston also defended his CapEx assumptions as conservative and his overall discount rate as reasonable based on sources cited in Saba's original report. *Id.* at 501–09. Johnston added that Saba's sensitivity analysis was flawed because it changed Johnston's weighting of the DCF to 100% and did not add back in a CSRP after removing the volatility adjustment. *Id.* at 512. Assuming Saba's critiques of CapEx and beta were valid, but correcting for weighting and the CSRP, Johnston came up with loss figures

[9] Saba and Johnston's respective calculations are reflected in one of the slides used during Johnston's testimony on October 2, 2024. That slide is included in an appendix to this opinion.

of $251.5 million and $265.1 million. *Id.* at 518–19; Appendix. Adjusting for the AccentHealth acquisition, as Saba suggested, further reduced the loss figures to $181.1 and $187.2 million. Appendix. Saba, for his part, disagreed with how Johnston characterized Saba's growth rates and fraud adjustments. Tr. 339–45. Saba stood by his use of the delayed pre-revelation revenue forecasts, as opposed to brand new forecasts, and his use of large, high-growth technology companies as comparables, which did not play a big role in his analysis. *Id.* at 342, 354–56.

The record also includes information about Goldman's own valuation of Outcome and its equity during the relevant time period. The FY 2017 audited financial statements for two Goldman entities show a write-down of its $100 million investment to just under $30 million. *Id.* at 637. Although the settlement was not finalized until February 1, 2018, these financial statements reflect the value of the investment under the settlement terms anticipated at the time of valuation, which were substantially similar to the final terms. *Id.* at 645–46; R. 945 at 9–10.[10] Gupta described the valuation methodology and the internal and auditor review processes. *E.g.*, Tr. 630–35, 637–42. He also walked through a modeling document summarizing Goldman's outlook, analysis, and conclusions about the value of the investors' equity. *See generally* R. 945. The modeling document includes qualitative commentary about

---

[10] The FY 2017 financial statements state that Goldman evaluated activity through March 23, 2018, and that Goldman had reached a settlement with Outcome, Inc., the founders, and affiliated parties by that time. The relevant excerpts are included in an appendix to this opinion. As such, the fact that settlement terms were still being negotiated after December 31, 2017 does not preclude the consideration of Goldman's valuation for the purpose of determining the appropriate additional offset for the value of investors' equity at the time of settlement.

the business, the revelation of the fraud, and settlement discussions. It also details the inputs and assumptions of Goldman's GPC analysis, including the revenue forecasts, comparables,[11] and the discount rate. R. 994-1. And it was shared with PricewaterhouseCoopers as part of the FY 2017 audit. Tr. 677–78; R. 945 at 35. The document reflects Goldman's valuation of the investors' equity interest at $152.7 million, which accounts for a $10 million legal fee and the $31 million distribution. R. 994-1 at 6.

In the Court's view, Saba's overly optimistic revenue forecasts make his analysis unreliable. Saba chose to start with the revenue forecasts developed by management before the revelation of the fraud. While he made some adjustments in those forecasts for the impact of the fraud, such as removing the overstated historical revenue and delaying the growth curve, Saba still projected massive revenue figures and growth. Those forecasts do not reasonably reflect the effect of customer defections from a highly concentrated customer base, with 58% of revenue deriving from Outcome's top ten customers, or the state of Outcome's reputation following the media coverage of the fraud. Tr. 395–96. Nor do they reflect Outcome's significant revenue misses throughout 2017. *Id.* at 64–65, 403. Expecting a company in these circumstances to achieve immediate, massive revenue growth in line with the pre-revelation forecasts defies common sense.

[11] Goldman selected four healthcare information technology companies and five digital media companies, the latter of which included Group 3 companies Alphabet, Zillow, and Yelp, as comparables. R. 994-1 at 5.

In contrast, the Court finds Johnston's analysis to be credible and reliable. As described, Johnston employed many of the same assumptions as Saba did in his analysis. Where they differed, Johnston's choices were overwhelmingly reasonable. That includes his use of actual revenue in 2017, which would have been available to investors in early 2018. It also includes his assumption that revenue would decline in the year following the exposure of the fraud and the exodus of customers and slowly grow in the years that followed. The Court agrees with Johnston that a reasonable investor in February 2018 would have taken these circumstances into account in projecting future revenue.

In fact, the investors did exactly that. Goldman as the lead investor created new forecasts after the revelation of the fraud. Tr. 695–96; R. 945 at 38–39. Based on historical, customer-specific data and predictive analysis, Goldman projected that revenues would decline in 2018 and then grow in the years that followed. The modeling document, the spreadsheets produced by PatientPoint, and the investor group financial forecast slide deck set forth those revised forecasts. R. 994-1; R. 994-2; R. 1033-8. Those forecasts reflect that almost half of Outcome's top 20 customers had either paused or cancelled their contracts after the revelation of the fraud. R. 994-1 at 3; R. 994-2 at 7–8; Tr. 627. As illustrated in the graph below, Goldman's forecasts (labeled as "Investor Group – Revenue Forecast) were significantly lower than Saba's and slightly lower than Johnston's.




R. 993 at 5. In this way, Goldman's analysis undermines Saba's analysis and corroborates Johnston's analysis. Further, the fact that Johnston's forecasts for 2018 through 2020, even in the Revenue Decline case, were over two times greater than actual revenue in those years shows that his forecasts were far from pessimistic. Although investors in early 2018 couldn't have predicted with certainty what would happen going forward, the actual revenue provides powerful corroboration for the reasonableness of Johnston's and Goldman's valuations.

Johnston's other analytical choices were rational too. As to comparables, he eliminated companies that were dissimilar to Outcome in their business, industry, and service offerings. The fact that Goldman used some of Saba's Group 3 entities as comparables in its early 2018 valuation does not make Johnston's selection of comparables illogical. In addition, Johnston's treatment of the AccentHealth

acquisition was entirely reasonable. *See* Tr. 520–23. A reasonable investor valuing the company in early 2018 would undoubtedly consider Outcome as a whole, including AccentHealth. To the extent Saba suggested otherwise, the Court disagrees.

However, the Court agrees with two of Saba's criticisms. First, the Court agrees that Johnston's CapEx forecasts were too high. Johnston derived his CapEx figures by taking the average CapEx percentage between 2014 and 2016 (35.3%) and applying it uniformly across the forecasted years. *Id.* at 182–83. But 2014 through 2016 was a period of high growth at Outcome, and generally, as a company grows, the CapEx percentage declines. *Id.* at 289, 300–301. Further, one of Outcome's primary capital expenditures was screens and tablet devices, which would not have become obsolete year-to-year. *Id.* at 181–82, 288, 291. The fact that Johnston's CapEx assumptions (35.3% between 2018 and 2021) were significantly higher than Goldman's projections before its initial investment (from 13% in 2018 to 8.4% in 2021), *id.* at 290, which would have also taken into account the 2014 through 2016 period, undermines their reliability.

Second, the Court credits Saba's criticism of Johnston's volatility adjustment. Although it was reasonable for Johnston to attempt to capture unsystematic risk in an objective way, it is does not appear to be a commonly used method and its support in the literature is unclear. Tr. 564–65. The Court finds the use of a CSRP to be the better supported, and therefore more reliable, choice. Even so, these two critiques do

not lead the Court to doubt the overall credibility of Johnston's analysis. Nor do they solve for the fundamental flaw in Saba's analysis: unrealistic revenue forecasts.

On those bases, the appropriate offset for the value of the interest the investors decided to keep in the settlement is $191.6 million, which is the value calculated using Johnston's Revenue Decline model adjusted for the CapEx and beta critiques and corrected for weighting and the CSRP. Tr. 530–31. With that offset, the loss to the investors is $265.1 million.[12]

As a final matter, there is no question that Defendants' fraud was the but-for and proximate cause of this loss to the investor victims. The evidence at trial plainly established that the investors—led by Goldman—were induced to buy into Outcome based on Defendants' or their co-schemers' false representations about the company's historical revenue and profitability, the strength of its client relationships, and its prospects for growth—and that the investors would not have invested had they known of the fraud. Evidence of this was overwhelming at trial. Defendants' insistence that the Government has not shown that the fraud caused investors to suffer any loss is premised on their misinterpretation of the framework for calculating restitution under the MVRA, as discussed above.

[12] While it is Defendants' burden to establish the offset due, *Anderson*, 866 F.3d at 765 (citing *Malone*, 747 F.3d at 486), the Government has set forth sufficient, reliable evidence to satisfy this burden through Johnston's analysis and testimony regarding the value of the investors' interest in Outcome at the time of settlement.

For those reasons, the restitution owed to the investor victims is $265.1 million, to be allocated among the investors in proportion to their portion of the total $487.5 million investment. *See* R. 915-1 at ¶¶ 4, 10.

b. Lender Victims

The Government seeks restitution for seven lender victims. R. 854, 903. The loss arises out of the December 2016 loan, which had two parts: (1) a Term B loan consisting of $325 million from debt investors used to acquire AccentHealth and refinance old debt; and (2) a $50 million line of credit from a group of large commercial banks. R. 854 at 17. After the funding, JPMorgan Chase Bank ("Chase") facilitated a secondary market where lenders and new participants could buy and sell parts of the Term B loan. *Id.* Accordingly, the lender victims include those who participated in the primary offering and those who purchased Outcome's debt on the secondary market created by Chase. Tr. 20.

Four lenders—Investcorp, Company A,[13] Main Street Capital Corporation, and Tennenbaum/BlackRock—sold their interests in Outcome shortly after the Wall Street Journal article about the fraud and did not take back any equity in Outcome. The three other lenders—MJX Asset Management ("MJX"), Column Park Asset Management ("Column Park"), and Chase Bank ("Chase")—received some combination of debt or equity as part of Outcome's 2019 restructuring.

[13] The Court uses "Company A" in light of Company A's counsel's request that it not be named in public filings.

Defendants argue that they are not responsible for "trading losses" that lenders experienced when selling their interests on the secondary market.[14] But here again, *Robers* provides the proper analytical framework for determining the restitution owed to these lender victims. The Court examines how much each lender was defrauded into paying and subtracts the money returned to them through paydowns and sales proceeds. *Robers*, 572 U.S. at 641. The difference is the restitution owed. There may be some additional offset due for any interest in Outcome the lenders chose to keep. *See Ghuman*, 966 F.3d at 579 (citing *Robers*, 572 U.S. at 644).

The analysis regarding the first four lenders is straightforward:

*Investcorp.* Investcorp purchased $15,184,502.94 of the Term B loan. R. 854-6 at 2; R. 864-7 at 2. It received $167,836.26 in principal paydowns and $10,464,037.53 in proceeds from sales in November 2017. R. 854-6 at 1; R. 864-7 at 1. The restitution owed to Investcorp is $4,552,629.15.

*Main Street Capital Corp.* A wholly owned subsidiary of Main Street Capital Corp. paid $9 million to purchase $10 million of the Term B loan. R. 854-8 at 2. It

---

[14] Defendants also state that the principal of the Term B loan was fully repaid by settlement monies, pointing to Johnston's report and the Government's answer to one of the Court's questions at sentencing. R. 870 at 15; R. 934 at 3. But neither the Government nor Johnston stated that the $75 million covered the entire outstanding balance on the principal. Instead, as Saba explained, "[a]s a result of [the settlement], the Company's debt obligations to third party lenders totaling $317.8 million were reduced to a term loan of $240.5 million and a line of credit balance of $6.3 million." R. 756-1 at ¶ 26; *see also id.* ¶ 136; Sentencing Tr. 38 (Government stating that "during the 2018 settlement . . . $75 million of the money that was transferred from Gravitas . . . was used to pay down the roughly $300 million in principal on the -- on the term loan").

received $500,000 in principal paydowns and sold the remaining principal for $7,908,740 in January 2018. *Id.*; R. 854-8 at 14. The restitution owed to Main Street Capital Corp. is $591,250.

*Tennenbaum/Blackrock*. Tennenbaum/Blackrock purchased $45,000,000.04 of the Term B loan at issuance. R. 854-10 at 2; R. 854-11 at 2. Accounting for the receipt of payments and proceeds from sales in November and December 2017, the amount owed in restitution to Tennenbaum/Blackrock is $607,708.43. R. 854-11 at 1–6.

*Company A.* Company A calculates the market value of the debt purchased before the Wall Street Journal article, excluding debt sold prior to that date, and subtracts principal paydowns and the market value of all debt sold, excluding debt attributable to purchases after the Wall Street Journal article. R. 558-3 at 23–25. But it is not clear that what Company A refers to as "market value" is equal to the amount paid or the proceeds earned in the sales. *Id.* Therefore, the Government has not met its burden of proving restitution as to Company A.

As to the three other lenders, each reports the difference between the amount paid and the amount returned through paydowns and, in MJX's case, secondary market sales. Those balances are as follows: MJX - $2,507,452.53; Column Park - $12,278,019; and Chase - $2,703,600. R. 854-3 at 2; R. 854-4 at 2; R. 854-5 at 2; R. 854-12 at 2. However, each lender chose to keep their interests in Outcome after the revelation of the fraud and the settlement, which was then exchanged for new debt and/or equity as part of the 2019 restructuring. R. 854-3 at 2; R. 854-5 at 2; R. 854-12 at 3. Accordingly, as the Government recognizes, and consistent with the approach

to restitution for the investor victims, some additional offset is due. That offset is properly based on the value of Outcome at the time of settlement described in Section III(a). The parties are to calculate the offset due for each of these three lender victims and submit updated restitution figures.

c. Pharmaceutical Company Victims

The Government seeks $48,447,467 in restitution to pharmaceutical company victims ("pharma victims"). That figure includes the amount overbilled on seven campaigns between 2012 and 2014 ($3,539,517) and the amount of overstated revenue in 2015 and 2016 ($15,075,037 in 2015 and $29,832,913 in 2016) as calculated by Michael Petron, the Government's expert in forensic accounting investigations who testified at trial. It does not include credit for any make-goods.

Defendants contest the Government's calculation of the property lost. According to Defendants, the loss for restitution is not the value of services promised but not received, but instead the difference between what the victims paid and the value they received. Defendants say the Court should focus on whether the pharma victims earned profits that exceeded the price they paid under the contracts. According to Defendants, the IMS studies—not those doctored by Desai—showed a return of investment of at least 1:1 in all cases identified by the Government. Defendants also challenge the reliability of Petron's analysis and questions why his analysis is more reliable than the Gibson Dunn analysis, on which Outcome's non-prosecution agreement ("NPA") was based.

Defendants further argue that any restitution for the property lost should be reduced by the $70 million Outcome returned to the pharma victims in cash and in-kind services as part of the NPA. The Government responds that no credit should be given for the settlement or any make-goods because that is property returned by Outcome, not Defendants. Instead, the Government argues, Defendants should be required to repay Outcome (or its successor in interest). The Government relies on section 3664(f)(1)(B), which states, "In no case shall the fact that a victim has received or is entitled to receive compensation with respect to loss from insurance *or any other source* be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B) (emphasis added).

The Government's argument is unavailing. Section 3664(f)(1)(B) "deals with setting the base amount of restitution, not with how collections from joint wrongdoers are credited." *United States v. Johnson*, 911 F.3d 849, 852 (7th Cir. 2018) (cleaned up). Section 3664(j) clarifies the scope of section 3664(f)(1)(B). Under section 3664(j)(1), "insurance and similar payments . . . do not reduce the amount of the restitution award (per § 3664(f)(1)(B)), and the wrongdoer must reimburse the source of those benefits." *Id.* But under section 3664(j)(2), "compensatory damages [do] reduce the amount the wrongdoer pays in restitution." *Id.*

Outcome is not like an insurer, guarantor, or indemnitor. It is a joint wrongdoer with potential criminal liability. That is the case even though the lender

and investor victims had interests in Outcome.[15] The payments Outcome made to the pharma victims pursuant to the NPA are, in essence, compensatory damages for the same loss at issue here. *See* U.S. Department of Justice, Office of Public Affairs, Press Release, "Outcome Health Agrees to Pay $70 Million to Resolve Fraud Investigation," Oct. 30, 2019 https://www.justice.gov/opa/pr/outcome-health-agrees-pay-70-million-resolve-fraud-investigation ("approximately $65.5 million of which has already been made through a combination of cash payments and in-kind services, and to set aside an additional $4.5 million to compensate any additional pharmaceutical clients who have not yet been made whole").[16]

The $70 million in cash and in-kind services paid to the pharma victims far exceeds the $48,447,467 in lost property calculated by the Government. Even if the Court found the Government to have proved the $48,447,467 figure by a preponderance of the evidence, Defendants have met their burden of proving a credit of at least that amount is appropriate.

The Government notes there is not perfect overlap between its calculation of loss from Petron's analysis and the compensation provided by Outcome. *See generally* R. 558-3; R. 914. Specifically, according to the Government, because of the difference

[15] The Government stated that if the Court ordered the "full restitution amount" to the investor victims, it would "return to [its] original position on restitution" and not seek repayment of the make-goods to Outcome's successor entity. Tr. 25.

[16] The Court notes that the Government did not seek any restitution for customer losses from defendants Kathryn Choi or Oliver Han because their plea agreements provided that "any restitution obligation [would be] offset by the payments made by Outcome to clients, including the payments or in-kind services that Outcome has already made or committed to make in the future to Outcome's pharma clients." R. 26, 28.

in Petron's methodology for calculating loss and Outcome's methodology for determining compensation, there are some pharma victims who were fully compensated for their loss, some who were undercompensated, and some who were overcompensated. The Government adds that only the cash paid by Outcome would be considered "property returned" under *Robers*. While the Government proposes a calculation of the "underrun" on a victim-by-victim basis, it does not appear to differentiate between cash and in-kind payments. *See* R. 558-3 at 15–16, 49–55. Further, Defendants' challenges related to the reliability of Petron's analysis and the use of the Gibson Dunn analysis remain. Litigating the reliability of the various analyses, conducting new analysis for cash payments, and resolving the conflict between the analyses significantly burden the parties and the Court. That burden outweighs the need to providing restitution to the pharma victims, who have already received $70 million in compensation for the same harm. The Court declines to order restitution to the pharma victims on this alternative basis. *See Malone*, 747 F.3d at 486.

IV. Motion to Quash

Shah issued a subpoena to Goldman on December 27, 2024. The materials sought by that subpoena are summarized as follows:

- Any and all forecasts generated by Goldman related to Outcome and its affiliates between October 4, 2017 and February 28, 2018;
- Any and all non-privileged documents, work papers, and communications relating to the calculations reflected in the 2017 modeling document;

- Any and all non-privileged documents or work papers provided to, or communications with, [Goldman's auditor] regarding the December 2017 and December 2018 valuations;

- Any and all non-privileged documents and communications relating to any valuations or forecasts generated by Goldman or any other entity relating to the impact of the fraud on the value, revenues, or profits of Outcome prior to the February 2018 restructuring; and

- Any and all non-privileged documents and communications between October 4, 2017 and February 1, 2018 related to Outcome's value; forecasted revenues, costs, profits; risk profile; the February 2018 settlement with its investors; and Goldman's outlook regarding Outcome's viability or health as well as any communications between Goldman and other Outcome investors.

R. 921-2.

Goldman filed a motion to quash the subpoena, which the Court granted by minute order with a written opinion to follow. R. 932. Following that order, the Court granted Defendants leave to issue a subpoena to Goldman for settlement-related communications with Outcome between October 2017 and February 2018. R. 960. Thereafter, the Court permitted Defendants to issue an additional subpoena to Goldman for internal discussions between investors regarding their valuation of Outcome in connection with the settlement. R. 998. Many of the materials sought and apparently obtained through the additional two subpoenas were sought through the quashed subpoena. *See generally* R. 998. In this way, practically speaking, the Court's order on the motion to quash was modified.

Nevertheless, the Court provides an explanation of its reasons for granting the motion to quash. Courts have held that Federal Rule of Criminal Procedure 17 gives parties the ability to subpoena evidence for post-trial matters. *E.g.*, *United States v. Boender*, No. 09-CR-186-1, 2010 WL 1912425, at *1 (N.D. Ill. May 12, 2010) (citations

omitted). Rule 17(c)(2) provides that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). *United States v. Nixon*, 418 U.S. 683, 698–99 (1974) set forth a four-part test for evaluating Rule 17 subpoenas, which courts have adapted to the post-trial setting as follows:

> The party seeking production of documents must show: (1) that the information is evidentiary and relevant; (2) that it is not otherwise procurable in advance through the exercise of due diligence; (3) that the party seeking production cannot properly prepare for post-trial motions or sentencing without advance inspection; and (4) that the application is made in good faith and is not simply intended as a general "fishing expedition."

*Boender*, 2010 WL 1912425, at *1 (citing *United States v. Winner*, 641 F.2d 825, 833 (10th Cir. 1981)). The Court finds that framework appropriate here.

The initial subpoena failed on the third and fourth prongs of the *Nixon* test. First, it sought materials that were not essential to the preparation of Shah's restitution defense. Goldman produced: an affidavit from Gupta; hundreds of pages of supporting materials, including transaction agreements and audited financial statements from 2018, 2019, 2021, and 2023; and two modeling documents reflecting all the variables and calculations used to arrive at a valuation for Outcome for December 2017 and December 2018. R. 778 at 53–58; R. 779; R. 931. And Gupta was comprehensively examined by both parties over the course of multiple days on the topics covered by the subpoena. During that testimony, he recalled the relevant events, including the initial investment in Outcome to the revelation of the fraud in October 2017, the February 2018 settlement, the 2019 restructuring, and the 2021

merger with PatientPoint. Most critically, he walked through Goldman's view of Outcome as an investment at the relevant points in time, detailing Goldman's valuation approach and methodology and explaining how Goldman accounted for the impact of the fraud. Second, by requesting "any and all" documents and communications related to certain broad topics, the subpoena represented an effort to search for new arguments, and in that sense amounted to a fishing expedition. *United States v. Tokash*, 282 F.3d 962, 971 (7th Cir. 2002) ("Rule 17(c) is not a discovery device to allow criminal defendants to blindly comb through . . . records in a futile effort to find a defense[.]"). It is for those reasons that the Court quashed the subpoena.

## Conclusion

For the foregoing reasons, restitution is owed to the investor victims and six lender victims, but not Company A or the customer victims. Restitution is owed as follows: $265,100,000 to the investor victims; $4,552,629.15 to Investcorp; $591,250 to Main Street Capital Corp.; and $607,708.43 to Tennenbaum/BlackRock. By September 4, 2026, the parties are to submit a calculation of the restitution owed to MJX, Column Park, and Chase consistent with this opinion and a proposed briefing schedule on the issue of allocation.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated: August 19, 2026

# Appendix

Outcome Holdings LLC

Exhibit A

Effect of Correcting Johnston Valuations and Gain/Loss Calculations

$ thousands

Scenario A - No Revenue Decline (Thousands USD)

| | [1] Per Johnston | As Recreated by Saba | Adjusted for Erroneous CAPEX Assumption and Beta Adjustment | Adjusted for Erroneous CAPEX Assumption, Beta Adjustment and Effect of AccentHealth Acquisition |
|---|---|---|---|---|
| Fair Market Value – 100% Controlling, Marketable Interest Basis of Outcome Health as of October 13, 2017 | $94,464 | $94,464 | $384,716 | $204,653 |
| Estimated Valuation as of February 1, 2018 (Rounded) | $190,000 | $190,000 | $480,000 | $530,000 |
| Total Gain (Loss) to Investors at February 1, 2018 | ($307,587) | ($307,940) | ($122,548) | ($94,819) |
| | | | ($251,484) | ($181,074) |

Updated for:
1. Unsystematic Risk Using Saba CSRP
2. Weighting Methodologies

Scenario B - Revenue Decline (Thousands USD)

| | [2] Per Johnston | As Recreated by Saba | Adjusted for Erroneous CAPEX Assumption and Beta Adjustment | Adjusted for Erroneous CAPEX Assumption, Beta Adjustment and Effect of AccentHealth Acquisition |
|---|---|---|---|---|
| Fair Market Value – 100% Controlling, Marketable Interest Basis of Outcome Health as of October 13, 2017 | $77,815 | $77,815 | $425,837 | $258,779 |
| Estimated Valuation as of February 1, 2018 (Rounded) | $170,000 | $170,000 | $520,000 | $580,000 |
| Total Gain (Loss) to Investors at February 1, 2018 | ($323,746) | ($322,888) | ($100,293) | ($67,946) |
| | | | ($265,131) | ($187,186) |

Updated for:
1. Unsystematic Risk Using Saba CSRP
2. Weighting Methodologies

Confidential

46

# Global Private Opportunities Partners II Offshore Holdings LP
# Notes to Consolidated Financial Statements

***31 December 2017***

## (11) Subsequent Events

The Partnership has evaluated activity through 23 March 2018, the date that the audited financial statements were available to be issued. On 7 November 2017 the Partnership commenced litigation against Outcome, Inc., its founders and affiliated parties. Outcome, Inc. was a portfolio company held through the Partnership's investment in GPOP II Aggregator (Del) I LP. The litigation made multiple claims against the defendants, including fraud and breach of contract. In connection with a settlement of the aforementioned litigation, Outcome, Inc. was dissolved on 31 January 2018. As of 31 January 2018, the Partnership, through the Aggregator, holds an equity and debt interest in NewOutcome, Inc. NewOutcome, Inc. owns an equity position in Outcome Holdings, LLC, which owns the operating businesses of Outcome Health. No other material events have occurred that would require recognition or disclosure.

consistent with the Partnership's general investment philosophy and therefore may not necessarily be an appropriate measure for the Partnership.

**(13) Subsequent Events**

The Partnership has evaluated activity through March 23, 2018, the date that the audited financial statements were available to be issued. On November 7, 2017 the Partnership commenced litigation against Outcome, Inc., its founders and affiliated parties. Outcome, Inc. was a portfolio company held through the Partnership's investment in GPOP II Aggregator (Del) I LP. The litigation made multiple claims against the defendants, including fraud and breach of contract. In connection with a settlement of the aforementioned litigation, Outcome, Inc. was dissolved on January 31, 2018. As of January 31, 2018, the Partnership, through the Aggregator, holds an equity and debt interest in NewOutcome, Inc. NewOutcome, Inc. owns an equity position in Outcome Holdings, LLC, which owns the operating businesses of Outcome Health. No other material events have occurred that would require recognition or disclosure.